**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Dan Flaten, individually and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br>NUTRIEN LTD.; NUTRIEN AG SOLUTIONS; THE MOSAIC CO.; MOSAIC FERTILIZER, LLC; CF INDUSTRIES HOLDINGS, INC.; KOCH INDUSTRIES, LLC; KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER WEVER, LLC; KOCH AGRONOMIC SERVICES, LLC; KOCH FERTILIZER, LLC; YARA INTERNATIONAL ASA; YARA NORTH AMERICA, INC.; CANPOTEX LTD.; INTERNATIONAL FERTILIZER ASSOCIATION; AND THE FERTILIZER INSTITUTE,<br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. SUMMARY ..................... 1

II. JURISDICTION AND VENUE ..................... 6

III. PARTIES ..................... 7

- A. Plaintiff ..................... 7
- B. Defendants ..................... 7
- C. Agents and Co-Conspirators ..................... 12

IV. FACTUAL ALLEGATIONS ..................... 14

- A. NPK Fertilizer Generally ..................... 14
- B. NPK Fertilizer Market Concentration ..................... 17
- C. Defendants' Conspiracy is Evidenced by In-Tandem Price Increases of NPK Fertilizer and Significant Profit Increases for Producer Defendants ..................... 20
- D. Other Factors Indicate Existence of Conspiracy in NPK Fertilizer Market ..................... 27

V. FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING ..................... 364

VI. ANTITRUST INJURY AND DAMAGES ..................... 376

VII. CLASS ACTION ALLEGATIONS ..................... 37

VIII. CLAIM FOR RELIEF ..................... 40

IX. REQUEST FOR RELIEF ..................... 422

X. DEMAND FOR JURY TRIAL ..................... 444

Plaintiff Dan Flaten ("Plaintiff") brings this action individually and on behalf of all other similarly situated direct purchasers against Defendants. Plaintiff seeks treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws for the anticompetitive conduct alleged herein and demands a trial by jury on all matters so triable. In support of this Complaint, Plaintiff alleges as follows based on personal knowledge as to the facts pertaining to himself and based on information and belief as to all other matters.

## I. SUMMARY

1. Plaintiff brings this suit against Defendants for their unlawful agreement, combination, or conspiracy to limit the supply and fix, raise, maintain, or stabilize prices of nitrogen, phosphate, and potassium (potash) fertilizer (collectively, "NPK Fertilizer") sold and purchased throughout the United States and its territories from January 1, 2020 to the present day.

2. Defendants are direct competitors and among the largest producers, manufacturers, suppliers, and sellers of NPK Fertilizer – Nutrien Ltd. ("Nutrien"); Nutrien Ag Solutions ("Nutrien Ag"); The Mosaic Co. ("Mosaic"); Mosaic Fertilizer, LLC ("Mosaic Fertilizer"); CF Industries Holdings, Inc. ("CF Industries"); Koch Industries, LLC ("Koch"); Koch Ag & Energy Solutions, LLC ("KAES"); Koch Agronomics Services, LLC ("KAS"); Koch Fertilizer, LLC ("Koch Fertilizer"); Koch Fertilizer Wever, LLC ("Koch Wever"); Yara International ASA ("Yara"); Yara North America, Inc. ("Yara NA"); Canpotex Ltd. (individually, "Canpotex," and collectively, "Producer Defendants") – as well as global fertilizer association, International Fertilizer Association ("IFA"), and

trade association, The Fertilizer Institute ("TFI"). The Producer Defendants, IFA, and TFI will be referred to collectively as "Defendants".

3. Producer Defendants have used their dominant market power to unlawfully suppress the country's NPK Fertilizer supply and artificially raise and fix prices.

4. Beginning no later than January 1, 2020, Defendants conspired, colluded, and entered into an agreement to artificially raise, fix, maintain, or stabilize prices of NPK Fertilizer at supracompetitive levels. Defendants' actions resulted in Plaintiff and members of the Class paying supracompetitive prices for NPK Fertilizer in the United States and its territories. Defendants' anticompetitive conduct, described further herein, violates Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

5. Defendants' conspiracy has enabled the Producer Defendants to increase their profit margins, while forcing U.S. farmers and consumers to pay inflated prices even when market conditions do not predict or deliver net farm income. The Producer Defendants maintain elevated prices without concern that their competitors will try to steal their market share or for potential new market entrants because high barriers to entry prevent new competitors from entering the market.

6. Inflated NPK Fertilizer prices reached all-time highs in March 2022. Although this extreme spike aligned with some favorable conditions for U.S. farmer net income, the Producer Defendants leveraged global disruptions to artificially inflate NPK Fertilizer prices with no intention of returning to a market-dependent pricing scheme.

7. Despite net farm income decreasing nearly 23% from 2022 to 2024, the Producer Defendants' profits have ballooned and NPK Fertilizer prices remain stubbornly high.

8. In response to the financial burden imposed on U.S. farmers, Congress and the Department of Justice have initiated investigations into Defendants' impact on the NPK Fertilizer market and have begun to examine whether anticompetitive behavior is to blame.

9. On September 26, 2025, the Department of Justice's Antitrust Division and the Department of Agriculture (USDA) signed a memorandum of understanding ("MOU") that formalized a partnership between the agencies to protect competition in key agricultural markets, including fertilizer.[1] The MOU emphasized the agencies' commitment to "protecting American farmers from the burdens imposed by high and volatile input costs," including fertilizer.[2]

10. On October 28, 2025, the U.S. Senate Judiciary Committee conducted a hearing on the issue entitled "Pressure Cooker: Competition Issues in the Seed & Fertilizer Industries." Senators spoke with U.S. farmers, small seed manufacturers, industry scholars, and TFI, a Defendant in this action, seeking solutions on how to curb the rising input costs that farmers face today. Farmers and researchers alike cited massive consolidation in the

---

[1] *Justice Department and USDA Coordinate to Protect Competition in Agricultural Inputs*, Off. of Pub. Affs. - Dep't of Just. (Sept. 29, 2025), https://www.justice.gov/opa/pr/justice-department-and-usda-coordinate-protect-competition-agricultural-inputs.

[2] *Memorandum of Understanding Between the Antitrust Division, Department of Justice and the Department of Agriculture Relative to Cooperation with Respect to Strengthening Competition for Agricultural Inputs*, Off. of Pub. Affs. - Dep't of Just. 1 (Sept. 26, 2025), https://www.justice.gov/atr/media/1415501/dl?inline.

fertilizer and seed industries as the reason why agricultural input costs, including NPK Fertilizer, have reached an unsustainable level.

11. In December 2025, President Donald Trump issued an Executive Order directing the U.S. Attorney General and the Chairman of the Federal Trade Commission to each establish a Food Supply Chain Security Task Force within their respective agencies to aggressively investigate price-fixing and anti-competitive practices across the food sector.[3]

12. On January 21, 2026, USDA Deputy Secretary Stephen Vaden participated in a webinar with the National Agricultural Law Center. Vaden warned: "[A]ntitrust laws exist for a reason, and that reason is because when an industry gets too concentrated, that is to say there are too few people competing, bad things can happen that undermine free enterprise. And there are signs that that may be happening in American agriculture."[4] The signs of antitrust violations presently occurring in American agriculture include "the duopoly that is Mosaic and Nutrien and their successful efforts over the past several years to constrain fertilizer supply in this country and drive up the costs that farmers are paying."[5]

[3] *Fact Sheet: President Donald J. Trump Addresses Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain*, The White House (Dec. 6, 2025), https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-addressessecurity-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain.

[4] *A Conversation with USDA Deputy Secretary Stephen Vaden: Update on Ag Trade, Financial Assistance, USDA Reorganization & Related Issues*, The Nat'l Agric. Law Ctr., at 43:25 (Jan. 21, 2026), https://nationalaglawcenter.org/webinars/vaden.

[5] *Id.* at 45:30.

13. Vaden further acknowledged that Mosaic and Nutrien were able to "constrain the supply of so many of the fertilizers our farmers depend on that they were able to get pricing power,"[6] before providing the following example of the two Defendants anticompetitive conduct:

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay. It's unacceptable.[7]

14. In February 2026, both the Iowa Corn Growers Association and the Texas Corn Producers Association sent separate letters to U.S. Attorney General Pam Bondi seeking information about what the U.S. Department of Justice is doing to pursue possible antitrust actions against the fertilizer industry. The letters reflected farmers' growing frustrations over lower crop returns while fertilizer prices continue to remain high.

15. On March 4, 2026, Bloomberg reported that the Department of Justice has begun investigating the U.S. Fertilizer Market for possible price fixing, including multiple Producer Defendants' practices. The Bloomberg report specifically cited the investigation is looking at whether Producer Defendants CF Industries, Koch Inc., Mosaic, Nutrien and Yara International colluded to raise prices for nitrogen, phosphate and potash.

---

[6] *Id.* at 46:24.

[7] *Id.* at 46:40.

16. To remedy Defendants' conspiracy and illegal actions described in this Complaint, Plaintiff brings this case on behalf of direct purchasers of NPK Fertilizer seeking, among other relief, damages for the overcharges direct purchasers have paid to Producer Defendants.

## II. JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), because this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court also has jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

18. This Court has personal jurisdiction over Defendants because they transacted business throughout the United States, including in this District, and have purposefully directed their activities at this District. Defendants have sold NPK Fertilizers in a continuous and uninterrupted flow of interstate commerce, including in this District, and have derived substantial revenue from those sales.

19. Defendants' conduct, as alleged herein, was directed at and had a direct, substantial, and reasonably foreseeable effect on interstate commerce. Defendants' activities substantially affected interstate trade and commerce throughout the United States, including in this District.

20. Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c), because one or more Defendants resided, transacted business, were found, or had agents in this District, and because a substantial portion of the affected interstate commerce described herein occurred in this District.

21. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class consists of more than 100 members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the Class is a citizen of a state different from at least one Defendant.

## III. PARTIES

### A. Plaintiff

22. Plaintiff Dan Flaten is North Dakota resident who purchased NPK Fertilizer directly from one or more of the Producer Defendants during the Class Period. Plaintiff's purchases were made at prices artificially inflated by Defendants or their co-conspirators through the conduct alleged herein. Plaintiff has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### B. Defendants

23. Defendant Nutrien is a publicly traded company, listed on the New York Stock Exchange (NYSE: NTR), with its principal place of business at 211 19th Street East, Suite 1700, Saskatoon, Saskatchewan, Canada, S7K5R6. Nutrien is the largest upstream fertilizer producer globally, with extensive midstream distribution capability. Nutrien's business practices are segmented into Nutrien Ag Solutions (i.e. retail), Potash, Nitrogen, and Phosphate.

24. Defendant Nutrien Ag is the wholly owned subsidiary of Nutrien. Nutrien Ag's principal place of business is located at 3005 Rocky Mountain Avenue, Loveland, Colorado 80538. Nutrien Ag is the retail business of Nutrien, the world's largest provider of crop inputs and services.

25. Defendant Mosaic is a publicly traded company, listed on the New York Stock Exchange (NYSE: MOS), with its principal place of business located at 101 E. Kennedy Blvd., Suite 2500, Tampa, FL 33602. Mosaic is the world's leading integrated producer of concentrated phosphate and potash nutrients for use in NPK Fertilizer.

26. Defendant Mosaic Fertilizer is a subsidiary of Mosaic that produces fertilizer. Mosaic Fertilizer is incorporated in Delaware with its principal place of business located at 101 E. Kennedy Blvd., Suite 2500, Tampa, FL 33602.

27. Defendant CF Industries is a publicly traded company, listed on the New York Stock Exchange (NYSE: CF), with its principal place of business located at 2375 Waterview Drive, Northbrook, Illinois 60062. CF Industries produces nitrogen-based NPK Fertilizer for sale throughout the United States and the United Kingdom.

28. Defendant Koch is incorporated in Kansas, with its principal place of business located at 4111 East 37th Street North, Wichita, Kansas, 67220.

29. Defendant KAES is a wholly owned subsidiary of Koch. KAES' principal place of business is located at 4111 East 37th Street North, Wichita, Kansas, 67220. KAES consists of Koch Fertilizer, Koch Energy Services, Koch Methanol and KAS. Collectively, these entities produce fertilizer and nutrient enhancement products to help farmers boost crop yields, supply methanol used to manufacture countless everyday products, and give energy customers the power to thrive.

30. Defendant KAS is a wholly owned subsidiary of Koch. KAS's principal place of business is located at 4111 East 37th Street North, Wichita, Kansas, 67220. KAS is a global company and fertilizer producer that strives to deliver plant nutrient solutions

designed to boost yield potential and reduce environmental impact. KAS is a leading manufacturer of nitrogen-based NPK Fertilizer throughout the United States.

31. Defendant Koch Fertilizer is a wholly owned subsidiary of Koch. Koch Fertilizer's principal place of business is located at 4111 East 37th Street North, Wichita, Kansas, 67220. Koch Fertilizer and its affiliates are collectively one of the world's largest producers and marketers of fertilizers, with a product portfolio that includes ammonia, urea, UAN, phosphate, potash and sulfur-based products.

32. Defendant Koch Wever is a wholly owned subsidiary of Koch. Koch Wever is a nitrogen fertilizer plant located in Wever, Iowa, and its principal place of business is located at 4111 East 37th Street North, Wichita, Kansas, 67220. Koch Wever, formerly Iowa Fertilizer Company LLC, opened in 2017 and was wholly owned by co-conspirator OCI N.V. ("OCI Global") until 2023. On December 18, 2023, OCI Global and KAES entered into a $3.6 billion agreement for the sale of 100% of OCI Global's equity interests in Iowa Fertilizer Company to KAES (the "Wever Acquisition"). The divestment was successfully completed on or before August 29, 2024. Upon completion of the Wever Acquisition, KAES President Mark Luetters noted that Koch has, in the past 15 years, invested $2 billion toward North American production facilities to enhance reliability, expand production, and improve logistics for its customers. The Wever Acquisition led to an increase in the total market share of the nitrogen fertilizer market held by Defendants Nutrien, CF Industries, and Koch., as is illustrated by the figure below.




33. Defendant Yara is a publicly traded, Norwegian company, listed on the Oslo Stock Exchange (YAR.OL), with its principal place of business located at Drammensveien 131, 0277 Oslo, Norway. Yara is a leading worldwide manufacturer of multiple varieties of nitrogen-based NPK Fertilizer.

34. Defendant Yara NA is a wholly owned subsidiary of Yara. Yara NA is headquartered at 100 North Tampa Street, Suite 3800, Tampa, Florida 33602. Yara NA markets a comprehensive range of nutrition solutions and services, including a broad product portfolio comprising nitrogen-based fertilizer and NPKs.

35. Defendant Canpotex is a Saskatchewan, Canada company with its principal place of business at 409 Third Avenue South, Suite 700, Saskatoon, Saskatchewan, Canada S7K5R5. Canpotex is a joint venture that is wholly owned by Mosaic and Nutrien, with each shareholder having equal ownership in the company. Canpotex is one of the world's largest potash exporters.

36. Defendant IFA is a global fertilizer association incorporated and registered in the United Kingdom, with a principal place of business in Paris, France. IFA's registered office is located at 9 Lincoln's Inn Fields, London, England, WC2A 3BP, United Kingdom.

37. IFA is the only global fertilizer association, with around 500 members in some 80 countries and a mission to promote the efficient and responsible production, distribution and use of plant nutrients. Members include fertilizer producers, traders and distributors, as well as their associations, service providers to the industry, research organizations, agtech start-ups and non-governmental organizations. IFA Members decide together on areas of common interest, joint actions, and positions on emerging and complex issues facing the fertilizer industry. IFA membership benefits include industry events and access to an industry data sharing platform, IFASTAT, which IFA boasts is a one-stop-shop for the most comprehensive statistical information on fertilizers and raw materials supply and fertilizer consumption.

38. Nearly all Defendants and co-conspirators named in this Complaint are members of IFA, including Defendants Nutrien, Nutrien Ag, Mosaic, Mosaic Fertilizer, CF Industries, KAES, KAS, Koch Fertilizer, Yara, Yara NA, Canpotex, and TFI. Members of the Producers Defendants' leadership currently sit on IFA's Board of Directors. Co-conspirators BHP Group Limited ("BHP") and J.R. Simplot Company ("J.R. Simplot") are also members of IFA.

39. At all relevant times, IFA was an active participant in the conspiracy to limit the supply and fix, raise, maintain, or stabilize fertilizer prices in the United States. At all

relevant times, IFA acted as a co-conspirator of Producer Defendants by facilitating the sharing of confidential, proprietary, and competitively sensitive information among them.

40. Defendant TFI is a trade association for the fertilizer industry with a principal place of business located at 4201 Wilson Boulevard, Suite 700, Arlington, Virginia 22203. TFI is a membership association that partners with fertilizer producers, wholesalers, retailers and the businesses that serve them and markets itself as the leading voice of the fertilizer industry. TFI encourages membership for access to trusted information and data as well as professional connections, and opportunities to make their voice heard. Members include Producer Defendants Nutrien, CF Industries, KAS, Koch Fertilizer, Yara NA, and Mosaic. Members of the Producer Defendants' leadership currently sit on TFI's Board of Directors.

41. At all relevant times, TFI was an active participant in the conspiracy to limit the supply and fix, raise, maintain, or stabilize fertilizer prices in the United States. At all relevant times, TFI acted as a co-conspirator of Producer Defendants by facilitating the sharing of confidential, proprietary, and competitively sensitive information among them.

**C. Agents and Co-Conspirators**

42. Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs, and for whom they are liable.

43. Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in order to advance the objectives of the scheme to benefit Defendants and themselves by artificially inflating the prices of NPK Fertilizer. Plaintiff reserves the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not they are named as defendants in this litigation.

44. These co-conspirators include OCI Global, BHP, and J.R. Simplot.

45. OCI Global is a publicly traded Dutch company, with its principal place of business located in Amsterdam, Netherlands. OCI Global produces and distributes nitrogen fertilizer. From 2013 to 2023, OCI Global was the parent company of Defendant Koch Wever. OCI Global developed Koch Wever, then Iowa Fertilizer Company LLC, in 2013 as the first world-scale, greenfield nitrogen fertilizer plant built in the United States in more than 25 years. During the Class Period, OCI Global and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold NPK Fertilizer in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

46. BHP is a publicly traded Australian company, with its principal place of business in Melbourne, Australia. BHP produces essential commodities through assets including potash. BHP holds interest in potash through wholly owned and operated ventures and through joint ventures not operated by BHP. BHP operates a potash mine in Saskatchewan, Canada, (known as “Jansen”), which is expected to begin production in

mid-2027. BHP contends Jansen will become one of the world's largest potash mines, producing approximately 8.5 million tons per year. BHP is targeting the United States as a market for future Jansen potash production.

47. J.R. Simplot is a privately held company incorporated in Nevada, with its principal place of business in Boise, Idaho. Simplot is an international agricultural and food company whose portfolio includes phosphate mining and fertilizer manufacturing. During the Class Period, Simplot and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold NPK Fertilizer in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## IV. FACTUAL ALLEGATIONS

### A. NPK Fertilizer Generally

48. Modern agriculture depends heavily on three essential macronutrients that plants must have in large quantities: nitrogen (N), phosphorus (P), and potassium (K). These nutrients are supplied to crops through NPK Fertilizer (named after the chemical symbols for the nutrients they contain). Each nutrient plays a different role in plant growth thus together they form the basis of most fertilizer programs around the world.

49. NPK Fertilizer is applied both individually and in blended formulations depending on crop and soil requirements. Farmers use single-nutrient products when a specific nutrient is needed, but other times blend fertilizers containing nitrogen, phosphorus, and potassium in set proportions.

50. The United States is one of the world's largest consumers of commercial fertilizers. The U.S. fertilizer market was valued at approximately $30 billion in 2025 and is projected to grow to approximately $40 billion by 2031.

***Nitrogen Fertilizers***

51. Nitrogen fertilizers are widely used in agriculture because nitrogen is the nutrient plants require in the greatest quantity. Nitrogen is a key part of chlorophyll, the pigment molecule in plants that enables photosynthesis, and it is also necessary for the formation of proteins and other biological compounds involved in plant growth. Adequate nitrogen supports the development of leaves and stems and is associated with faster vegetative growth and higher crop yields.

52. Roughly half of our global food production depends on synthetic nitrogen. Without access to synthetic nitrogen fertilizer, half of our global population would not survive. The figure below illustrates global reliance on nitrogen fertilizers.



53. Today, most nitrogen fertilizers originate from industrial anhydrous ammonia, which is synthesized using the Haber–Bosch process. In this process, nitrogen gas from the air is combined with hydrogen, typically derived from natural gas, under conditions of high temperature and pressure in the presence of a catalyst to produce ammonia. This ammonia serves as the principal intermediate used to manufacture a variety of nitrogen fertilizer products.

54. Common nitrogen fertilizers include Urea, Ammonium nitrate, Ammonium sulfate, and Urea ammonium nitrate solution. These fertilizers vary in nitrogen concentration and form but each supplies nitrogen that plants absorb as nitrate or ammonium ions. They are commonly sold as small, typically round granules or "prills."

***Phosphorus Fertilizers***

55. Phosphorous is essential to plants' conversion of sunlight into energy. Phosphorous also supports photosynthesis, energy transfer, root development, flower and seed formation, cell division, cell enlargement, and the transfer of genetic information. Adequate phosphorus availability is therefore associated with strong root systems and successful crop establishment.

56. Phosphorus-based fertilizers come from phosphate rock, a naturally occurring mineral mined from geologic deposits. The rock is treated with sulfuric acid to release phosphorus and produce phosphoric acid. When combined with ammonia and sulfur, phosphoric acid can create various liquid and dry fertilizer products, including monoammonium phosphate (MAP), diammonium phosphate (DAP), and triple superphosphate (TSP).

***Potassium Fertilizers***

57. Plants need potassium to help regulate water movement within plant tissues, activate enzymes involved in metabolism, support plant tolerance to environmental stresses such as drought or disease, and improve yield and quality. When plants have adequate potassium, they are healthier, more resilient, and more productive.

58. Potassium-based fertilizers originate from potassium chloride, also known as potash. Potash is mined from geological deposits of evaporite minerals, which were formed when ancient seas and saltwater lakes evaporated millions of years ago, leaving behind layers rich in potassium salts. After potash is mined, it is refined into different fertilizer products—including potassium chloride and potassium sulfate—and shaped into small, uniform granules so farmers can apply it easily and plants can absorb the nutrients more efficiently.

**B. NPK Fertilizer Market Concentration**

59. NPK Fertilizer is favored over other fertilizers because they supply the three macronutrients that crops need in the largest amounts, are highly concentrated, predictable, and fast-acting, allowing farmers to efficiently meet crop nutrient requirements. Unlike organic fertilizers, NPK Fertilizer provides precise nutrient content, are easy to store and transport, release nutrients more quickly into the soil, and are adaptable to most major crops and soil types, making them the primary choice for high-yield, modern agriculture.

60. The NPK Fertilizer industry has experienced dramatic consolidation since at least the late-1970s, transforming from a competitive market into a highly concentrated market dominated by the Producer Defendants.

61. As of 1990, there were approximately 30 companies in the nitrogen fertilizer market, 15 companies in the phosphorous fertilizer market, and eight companies in the potassium fertilizer market.

58. As of 2022, only 13 companies remained in the nitrogen market, with Producer Defendants controlling 75% of the market. The remarkable market concentration is illustrated by the chart below.

59. As of 2024, the Producer Defendants control at least 82% of the nitrogen fertilizer market, 90 to 95% of the potash fertilizer market, and 91% of the phosphate fertilizer market in North America.




60. Specifically, the NPK Fertilizer industry is dominated by three companies. Mosaic controls the American phosphate market, CF Industries controls the nitrogen

sector, and Nutrien controls the potash market as the leading member of a duopoly with Mosaic.

61. Market concentration in the NPK Fertilizer industry can be measured by the Herfindahl-Hirschman Index ("HHI"), a calculation that assigns a number from 0 to 10,000 to an industry to quantify competition levels. The higher the HHI, the less competition exists in the industry. Scores ranging from 1,800 to 2,500 indicate high market concentration, and a score above 2,500 suggests the possibility of an oligopoly or monopoly. The NPK Fertilizer market shows extremely high levels of concentration in United States and North America alike:




**HHI Measures for Fertilizers by Geographic Scope by Year**

### C. Defendants' Conspiracy is Evidenced by In-Tandem Price Increases of NPK Fertilizer and Significant Profit Increases for Producer Defendants

62. Since 2020, publicly available pricing disclosures show a strong parallel pattern in the price of NPK Fertilizer: a sharp increase in 2021 to 2022, price decreases in 2023, and renewed increases beginning in 2024 and continuing through the present. The following graphs charting the Producer Price Indices (PPIs) for NPK fertilizers demonstrates the lockstep price movements of these products.

**Producer Price Index for Fertilizers (Last 10 Years)**




**Producer Price Index for Nitrogen Fertilizers (Last 10 Years)**



**Producer Price Index for Phosphorous Fertilizers (Last 10 Years)**




**Producer Price Index for Potash (2018–2022)**




63. Specifically, as to nitrogen fertilizers, prices spiked in 2021-2022. By December 2021, the USDA estimated year-over-year price increases of 235% for anhydrous ammonia, 149% for urea, and 192% for liquid nitrogen (32% UAN):




64. Throughout 2021 and 2022, Defendants raised prices in lockstep. CF Industries reported in its 2022 Annual Report that average prices in its ammonia segment increased 87 percent, from $498 per ton in 2021 to $936 in 2022; average granular urea prices increased 45 percent, from $438 per ton in 2021 to $633 in 2022; average UAN prices increased 93 percent, from $272 per ton in 2021 to $526 in 2022; and average ammonium nitrate prices increased 78 percent from $297 per ton in 2021 to $530 in 2022.

65. Around the same time, Nutrien reported similar average Nitrogen Fertilizer Product prices hikes when it reported its Fourth Quarter 2022 and Full-Year 2022 Results: average ammonia prices increased 104 percent year-over-year, from 2021 to 2022, from $477 per ton in 2021 to $973 in 2022; average urea prices increased 46 percent, from $478 per ton in 2021 to $696 in 2022; and average prices for "Solutions, nitrates and sulfates" increased 69 percent, from $238 per ton in 2021 to $402 in 2022.

66. Reporting its average sales prices in their Phosphate Fertilizer segments in February 2023, Nutrien reported a 34 percent year-over-year increase in average sales prices from 2021 to 2022 (from $602 per ton in 2021 to $806 in 2022), while Mosaic reported a 48 percent year-over-year increase over this time (from $618 per metric ton in 2021 to $913 in 2022).

67. In its Potash segment, Nutrien reported that its average prices for its "Manufactured product" increased 113 percent year-over-year, from $296/ton in 2021 to $630/ton in 2022. Mosaic's prices mirrored similar increases: for MOP, average prices increased 121 percent from $285/ton in 2021 to $632/ton in 2022; and for all finished products, by 94 percent, from $321/ton in 2021 to $643/ton in 2022.

68. Beginning in mid-2024, fertilizer prices across all three nutrient categories began rising again:




69. Repeating the lockstep price increases in previous years, Defendants prices again rose in parallel from 2024-2025:

70. Nutrien reported that net selling prices rose across all major Nitrogen products from 2024 to 2025, including ammonia from approximately $410 to $422 per ton in 2025, urea from approximately $421 to $490, and "[s]olutions, nitrates and sulfates" from approximately $221 to $268. Nutrien reported that its average net selling price across all of its Nitrogen products increased from approximately $324 per ton in 2024 to $365 per ton in 2025.

71. CF Industries reported similar increases: for full-year 2025, CF Industries reported increase in average selling prices, from approximately $425 per ton for ammonia in 2024 to $473 in 2025, $354 per ton for granular urea in 2024 to $443 per ton in 2025, $248 per ton for UAN in 2024 to $311 in 2025, and $286 per ton for ammonium nitrate in 2024 to $317 per ton in 2025.

72. In February 2026, Mosaic reported that its sales price had increased on DAP, a Phosphate Fertilizer, by 14.5 percent, from $585 in 2024 to $670 in 2025. Around the same time, Nutrien reported a similar increase in Phosphate Fertilizer sales prices: from an average net selling price for the first three quarters of 2024 of $611 to $677 for the same period of 2025, representing a 10.8 percent increase.

73. Similarly, in February 2026, Nutrien reported that its North American Potash net selling price rose from approximately $270 per metric ton in the fourth quarter of 2024 to approximately $305 per metric ton in the fourth quarter of 2025—an increase of roughly 13 percent. Mosaic likewise reported in February 2026 that its realized Potash prices increased from approximately $199 per ton in the fourth quarter of 2024 to approximately

$264 per ton in the fourth quarter of 2025, representing an increase of approximately 33 percent.

74. These increases cannot be explained by input costs or other economic factors. In 2021, Nutrien's gross manufacturing profit margin was 669% from 2020, despite its costs of goods sold only increasing by only 58% percent. This dramatic expansion of profits continued into 2022, with Mosaic improving on its 2021 profits by 120%, Nutrien by 142%, and CF Industries by 212%.

75. Indeed, while U.S. farmers and consumers paid higher prices for NPK Fertilizer, Producer Defendants continue to experience record high profits:




76. The coordinated resumption of price increases across all three nutrient markets in 2024–2026, after the 2023 decline, replicates the same pattern observed during

the 2021–2022 spike. This pattern of recurring, synchronized price movements across three chemically distinct product categories is more consistent with coordinated conduct than with independent pricing decisions made by companies responding to different cost structures and supply-demand conditions.

77. Defendants' own statements emphasize that their price increases were not the result of increased input costs. For example, in May 2022, Nutrien reported increased profitability in its Nitrogen sector, which it attributed to "[h]igher net realized selling prices [that] more than offset higher natural gas costs." CF Industries Holdings similarly stated that its price increases were "due primarily to higher average selling prices partially offset by higher natural gas costs[.]"

78. These three fertilizer markets—nitrogen, phosphate, and potassium—involve different chemical products, different production processes, different raw material inputs, and in many cases different producers. In a competitive market, one would expect the prices of these distinct products to be driven by their respective cost structures and supply-demand fundamentals, producing differentiated price trajectories. The synchronization of prices across all three markets is anomalous in a competitive setting and is more consistent with coordinated conduct and collusion among Producer Defendants who—uniquely in these markets—participate across multiple nutrient categories and maintain formal and informal mechanisms for the exchange of competitively sensitive information.

## D. Other Factors Indicate Existence of Conspiracy in NPK Fertilizer Market

79. Collusion can occur in almost any industry, however it is more likely to occur in some industries over others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

80. Legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors" which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[8] Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism.

81. Here, multiple plus factors support the plausible inference that Defendants are members of a per se unlawful price fixing cartel. These include: (1) concentrated supply-side market; (2) a standardized, homogenous commodity product; (3) high barriers to entry; (4) inelastic demand; (5) unconcentrated demand-side market; (6) Producer Defendants' exchange of competitively sensitive information and other opportunities to collude; and (7) Producer Defendants' history of anticompetitive conduct.

82. ***Concentrated supply-side market*: **High market concentration increases the likelihood of collusion and other anticompetitive practices. An industry dominated by a few companies allows for easier coordination of price increases, territorial allocation, and

---

[8] William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011).

information sharing. Over time, Producer Defendants can leverage the concentrated market to maintain supra-competitive prices. As aforementioned, as of 2024, the Producer Defendants control at least 82% of the nitrogen fertilizer market, 90 to 95% of the potash fertilizer market, and 91% of the phosphate fertilizer market in North America. Because the production of NPK Fertilizer is highly concentrated, with the Producer Defendants controlling the vast majority of production, the NPK Fertilizer market is highly susceptible to collusion.[9]

83. ***Standardization*: ** NPK Fertilizer is standardized because their nutrients are basic chemical components traded as commodities and used interchangeably, regardless of the specific source. This standardization also makes it easier for competing firms to coordinate on a common price structure.[10]

84. In other words, NPK Fertilizer is fungible, homogenous commodity product with little differentiation, and one supplier's type is readily substituted for another supplier. As a result, buyers make purchase decisions based largely, if not entirely, on price.

85. ***High barriers to entry*: ** There are also high barriers to becoming a producer of NPK Fertilizer. A large capital investment is required to enter the industry, as companies

---

[9] *Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects*, Dep't of Just. – Antitrust Div. (Oct. 10, 2023), https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding ("Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories.").

[10] *Id.* ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.").

wishing to enter must purchase machines and operating space to manufacture NPK Fertilizer. The importance of research and development in the industry also may deter new entrants.

86. Potential entrants to the industry also must make a significant financial investment to acquire, maintain, and update production facilities and equipment. Larger players have an advantage because they can build or acquire multiple manufacturing facilities, discouraging others from entering.

87. The start-up capital necessary to compete with today's NPK Fertilizer producers would thus be substantial. NPK Fertilizer producers have significant economies of scale, utilizing large and expensive production facilities. Barriers to entry in NPK Fertilizer manufacturing both prevent new competitors from entering the market and make the market susceptible to collusion.

88. Furthermore, the NPK Fertilizer market exhibits classic structural conditions under which collusion is more plausible and more durable: concentrated production, high fixed costs, dependence on scarce or geographically concentrated inputs, technically complex production processes, and substantial regulatory and logistical barriers that deter timely entry or expansion.

89. ***Inelastic demand*:** Demand for NPK Fertilizer is inelastic, as the demand for NPK Fertilizer is unlikely to change due to price increases. Industries with inelastic demand, such as the NPK Fertilizer industry, are more susceptible to cartel formation and behavior than industries with elastic demand.

90. A lack of substitute goods may be a characteristic of inelastic demand. NPK Fertilizer cannot be interchanged freely with other goods—although there are other fertilizers, NPK Fertilizer is unique because it provides precise, balanced nutrients, rapid soil availability, and broad crop adaptability, making them distinct from other fertilizers. Customers similarly do not view NPK Fertilizer as interchangeable with other fertilizers.

91. ***Unconcentrated demand-side market*****:** The unconcentrated nature of the demand side of the NPK Fertilizer market and lack of buyer power sufficient to stimulate competition also makes this market susceptible to collusion. Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Producer Defendants to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing agreement carries large penalties.

92. ***Exchange of competitively sensitive information and other opportunities to collude***: Collusion also may be facilitated by trade associations and business relationships.[11] Here, Defendants have had multiple opportunities to collude and exchange confidential information through trade associations to which they belonged and served as board members as well as through other strategic partnerships.

93. First, as described above, Producer Defendants Mosaic and Nutrien jointly own Canpotex. Canpotex is a Canadian export marketing agency through which Mosaic

[11] *Id.* ("Collusion is more likely if the competitors know each other well, through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another.").

and Nutrien collectively sell their Canadian potash into overseas markets. Canpotex thus fosters a business relationship whereby Mosaic and Nutrien share a range of competitively sensitive data, including production data, pricing information, and sales volumes. The data Canpotex collects is data which would normally be kept confidential given its competitively sensitive nature. Moreover, Mosaic and Nutrien employees display significant overlaps with that of Canpotex. Nutrien's CEO Kenneth Seitz was formerly the President and CEO of Canpotex, for instance.

94. Second, nearly all Defendants and co-conspirators named in this Complaint are members of IFA, including Defendants Nutrien, Nutrien Ag, Mosaic, Mosaic Fertilizer, CF Industries, KAES, KAS, Koch Fertilizer, Yara, Yara NA, Canpotex, and TFI. Members of the Producers Defendants' leadership—specifically, Kenneth Seitz (Nutrien), Chris Bohn (CF Industries), Bruce Bodine (Mosaic), and Svein Tore Holsether (Yara)—currently sit on IFA's Board of Directors. Co-conspirators BHP and J.R. Simplot are also members of IFA.

95. IFA is the only global fertilizer association, with members at all levels of the fertilizer supply chain: fertilizer producers, traders and distributors, as well as their associations, service providers to the industry, research organizations, agtech start-ups and non-governmental organizations.

96. IFA Members decide together on areas of common interest, joint actions and positions on emerging and complex issues facing the fertilizer industry today. IFA membership benefits include industry events and access to an industry data sharing platform, IFASTAT.

**DATA & INTELLIGENCE**

IFASTAT is your go-to for global fertilizer data:

- 15+ years of supply, production & trade data
- 70 years of nutrient consumption insights
- Regular market analysis and outlooks
- Country profiles, nutrient efficiency stats, and more

**CONFERENCES & EVENTS**

IFA hosts top-tier global gatherings, including conferences and events:

- **Annual Conference** – Industry's flagship networking event
- **Cultivating Tomorrow** – Innovation meets sustainability
- Regional and thematic fora on markets, innovation, sustainability and more (Global Markets Conference, Crossroads Asia-Pacific Conference, Strategic Forum)

**DRIVING SUSTAINABILITY**

We provide:

- Production **certification, benchmarks** and **roadmaps**
- Safety, circular economy and decarbonization **initiatives**
- **Training** via the Sustainable Fertilizer Academy
- Awards recognizing excellence in safety, health and environment

97. IFA boasts IFASTAT is the leading source of fertilizer and raw materials statistics in the world. Compiled by IFA's Market Intelligence team, IFASTAT is a one-stop-shop for the most comprehensive statistical information on fertilizers and raw materials supply and fertilizer consumption, including (i) 70 years of global fertilizer data, (ii) 15 plus years of supply, production & trade data, and (iii) regular market analysis. A key feature of IFASTAT data is its Market Outlook reports. Only members may access the medium-term and short-term supply and demand detailed Market Outlook Reports, with the public access limited to summaries of these reports.

98. IFA members also get access to exclusive events that facilitate the sharing of information. These events are thus tailor-made for collusion. One such event is the IFA Annual Conference, where all the key fertilizer players gather to network and learn about

the latest developments in the industry. Additionally, IFA coordinates annual regional events to promote industry cooperation.

99. Third, Producer Defendants Nutrien, CF Industries, KAS, Koch Fertilizer, Yara NA, and Mosaic are all members of TFI, with Members of the Producer Defendants' leadership currently sitting on TFI's Board of Directors. As of April 2026, TFI Board Members included the following Producer Defendants: Bruce Bodine (Mosaic); Chris Bohn (CF Industries); Scott McGinn (Koch Fertilizer); Sabine Schröder (Yara NA); and Kenneth Seitz (Nutrien).

100. Besides offering exclusive members-only market volatility data and resources, TFI also sponsors a number of trade events, including an Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference. Like IFA, TFI's shared data and regular member events promote collusion between Producer Defendants.

101. Finally, Producer Defendants are also members and hold leadership positions in the following additional organizations, associations, and groups: Fertilizer Canada; The Sulfur Institute; Fertilizer Industry Round Table; and Agricultural Retailers Association. Shared membership and leadership within these entities only further promotes collusion.

102. ***History of anticompetitive conduct*:** Finally, the NPK Fertilizer industry has faced scrutiny for potential anticompetitive conduct in the past.

103. In the early 1990s, several Potash producers were the subject of a price-fixing investigation by the Antitrust Division of the United States Department of Justice.

104. In 2008, U.S. purchasers filed antitrust lawsuits alleging that major producers—including companies such as Mosaic, PotashCorp, and Agrium—coordinated production and sales to keep potash prices artificially high. Plaintiffs alleged producers shared market information, allocated volumes, and restricted output in furtherance of the conspiracy. Several companies later settled private antitrust claims, with settlements around $43.75 million each from firms such as Mosaic and PotashCorp (without admitting wrongdoing).

## V. FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

105. Plaintiff and Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or Class Members on inquiry notice that there was a conspiracy to fix prices for NPK Fertilizer.

106. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Class.

107. Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2026, when news of the DOJ's investigation into NPK Fertilizer prices broke.

108. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any applicable statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and Class Members have as a result of the unlawful contract, combination, or conspiracy alleged in this Complaint.

109. Additionally, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. During the Class Period, Defendants continued to make sales of NPK Fertilizer impacted by Defendants' continually renewed and adjusted price-fixing and industry data exchange agreements.

110. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept them current with market conditions. They were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and Class Members.

111. As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and Class Members starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of NPK Fertilizer by a Producer Defendant constituted a new cause of action for purposes of the statute of limitations.

## VI. ANTITRUST INJURY AND DAMAGES

112. Defendants' anticompetitive conduct has had the following effects, among others:

a) Price competition in the NPK Fertilizer Market has been restrained or eliminated;

b) Prices for NPK Fertilizer sold by the Producer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

c) Direct purchasers of NPK Fertilizer have been deprived of free and open competition; and

d) Direct purchasers of NPK Fertilizer have paid artificially inflated prices.

113. The purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of NPK Fertilizer and, as a direct and foreseeable result, Plaintiff and the class have paid supracompetitive prices for NPK Fertilizer during the Class Period

114. By reason of the alleged violations of the antitrust laws, Plaintiff and Class Members have sustained injury, having paid higher prices for NPK Fertilizer than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

115. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII. CLASS ACTION ALLEGATIONS

116. Plaintiff brings this action individually and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking treble damages, equitable and injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the members of the following class:

> All persons and entities who purchased NPK Fertilizer directly from any of the Producer Defendants or any of their co-conspirators in the United States at any time from January 1, 2020 until the present (the "Class Period").
>
> Specifically excluded from this Class are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

117. Plaintiff reserves the right to amend this Class definition, including, without limitation, the Class Period.

118. Class Identity: The above-defined Class members are readily identifiable from information and records in the possession Defendants.

119. Numerosity: Plaintiff does not know the exact number of class members because such information is presently in the exclusive control of the Defendants. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of

class members geographically dispersed throughout the United States, such that joinder of all class members would be impracticable.

120. Typicality: Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased NPK Fertilizer directly from one or more of the Producer Defendants and were damaged by the same common course of wrongful conduct.

121. Common Questions Predominate: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual class members, including, but not limited to:

a) Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of NPK Fertilizer sold in interstate commerce in the United States in violation of federal antitrust laws;

b) Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws.

c) Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached

d) The identity of the participants of the alleged conspiracy;

e) The scope and duration of the alleged conspiracy;

f) The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

g) The effect of Defendants' alleged conspiracy on the prices of NPK Fertilizer sold in the United States during the Class Period;

h) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Class;

i) Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

j) The appropriate class-wide measure of damages; and

k) Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the Class.

122. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

123. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and class members do not have interests in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this

litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

124. Injunctive Relief: Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII. CLAIM FOR RELIEF

### Violation of Sections 1 and 3 of the Sherman Act
### Section 4 and 16 of the Clayton Act
### (15 U.S.C. §§ 1, 3, 15(a), 26)

125. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

126. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2020, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for NPK Fertilizer in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

127. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2020, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants agreed with each other to exchange competitively sensitive, non-public information regarding prices, output, supplies, and costs to raise, fix, maintain, or stabilize prices for NPK Fertilizer in the United States. The agreement was intended to and did unreasonably restrain trade, and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the NPK Fertilizer market in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

128. Pursuant to the agreement, Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of NPK Fertilizer sold in the United States to Plaintiff and members of the Class.

129. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a quick look or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, such justifications would have been reasonably achieved through less restrictive means of competition.

130. The contract, combination, or conspiracy alleged herein has had the following effects, among others:

a) Price competition in the sale of NPK Fertilizer has been restrained, suppressed, and/or eliminated in the United States;

b) Prices for NPK Fertilizer sold by the Producer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

c) Those who purchased NPK Fertilizer directly from the Producer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

131. Plaintiff and Class Members have been injured and will continue to be injured in their businesses and property by paying more for NPK Fertilizer purchased directly from the Producer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

132. Plaintiff and Class Members are entitled to damages, treble damages, and injunctive relief against Defendants, preventing and restraining the violations alleged herein.

## IX. <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests judgment against Defendants, as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that

notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. That the unlawful contract, combination, or conspiracy alleged herein be adjudged and decreed in violation of Sections 1 and 3 of the Sherman Act;

C. That Plaintiff and the Class recover damages to the maximum extent allowed under federal law, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled to the extent such laws permit;

D. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

F. That Plaintiff and the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G. That Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees, expenses, and costs as provided by law; and

H. That Plaintiff and the Class have such other and further relief as the case may require and the Court may deem just and proper.

## X. DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, hereby requests a jury trial pursuant to Federal Rule Civil Procedure 38(b) on any and all claims so triable.

Dated: April 22, 2026

*/s/ Daniel C. Hedlund*

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#0388166)
Anthony J. Stauber (#0401093)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 So. Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
tstauber@gustafsongluek.com

Dianne M. Nast *(pro hac vice forthcoming)*
Joseph N. Roda *(pro hac vice forthcoming)*
Michael S. Tarringer *(pro hac vice forthcoming)*
Joanne E. Matusko *(pro hac vice forthcoming)*
**NASTLAW LLC**
1101 Market Street, Suite 2801

Philadelphia, PA 19107
Tel: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com
jnroda@nastlaw.com
mtarringer@nastlaw.com
jmatusko@nastlaw.com

Kenneth A. Wexler *(pro hac vice forthcoming)*
Melinda J. Morales *(pro hac vice forthcoming)*
Gwyneth F. Lietz *(pro hac vice forthcoming)*
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive, Suite 5450
Chicago, Illinois, 60606
Tel: (312) 346-2222
Fax: (312) 346-0022
kaw@wbe-llp.com
mjm@wbe-llp.com
gfl@wbe-llp.com

***Counsel for Plaintiff and the Proposed Class***